Good morning, Your Honors. May it please the Court, I am Rachel Zimmerman-Skobe on behalf of Appellant Cosmetic Warriors Ltd. Latches is not supposed to be a gotcha defense. Junior users who have knowledge of a senior user's prior rights should not be encouraged to avoid bringing those potential conflicts to a head in the hopes that if they stay under the radar of the senior user long enough, they may be able to defeat the senior user's right to relief. That's what happened in this case fundamentally. Pinkett knew from day one about Cosmetic Warriors' prior rights in the Lushmark. They knew about the fact that women's clothing and cosmetic products were closely related goods often offered under the same brand. And they were told by the Canadian Trademark Office in 2010 that Cosmetic Warriors also claimed rights on clothing. Instead of trying to resolve that conflict then in 2010 by challenging Cosmetic Warriors' claim to clothing in Canada or any other way bringing themselves to the attention of Cosmetic Warriors, Pinkett abandoned its Canadian trademark application ensuring that that conflict would not come to light, waited for four years, and then launched an anonymous attack on Cosmetic Equity is not supposed to reward that type of conduct. The briefing in this case identifies several errors in the District Court's judgment that led to the erroneous outcome here. And absent contrary direction from the Court, I'd like to talk today about three issues. The first is the District Court's abuse of discretion in applying the e-Systems factors to the facts of this case. The second is the District Court's error in conflating the doctrine of willful infringement with the doctrine of unclean hands. And the third is the fact that under the Supreme Court's recent decisions in Petrella and SCA Hygiene, latches can no longer be asserted against a confusion-based cancellation action that's brought under Section 1064.1. Starting with e-Systems, we recognize that the abuse of discretion standard is a deferential one, but that does not mean the District Court judgments issued are not reviewable. In this case, the District Court completely failed to give any consideration to factors one and five of the e-Systems test, which are the strength and value of the asserted mark, which in this case was indisputably extremely strong, both from an inherent standpoint as well as a commercial standpoint, with over a billion dollars in sales in the United States alone. The District Court also failed to properly apply the diligence factor. Under the e-Systems test, diligence looks at whether the mark owner's conduct was showing an active policing effort, not just against the particular defendant in this case, but in... Counsel, I'm looking at the denial of summary judgment, and the Court there on page 18 of its order, GR 1121, listed the six e-Systems analysis factors and went through each one of them one by one. There is a discussion of number one, and he said that factor weighs against the factor of finding of latches. I don't know why you would claim that the District Court got this one wrong when he found it in favor of your client. So that was the District Court's summary judgment order, which you are correct. The District Court did not grant summary judgment of latches in this case. The judgment that we're appealing is the judge's judgment that was issued after trial, and that was made in the form of first an oral opinion on the record following trial, where he outlined the basis for finding latches against Cosmetic Warriors, as well as in the subsequent somewhat further fleshed out written decision that he read into the record as well. Neither one of those decisions addresses these factors, the strength of the Cosmetic Warriors mark and the competition between the parties. And in... Cites it, though. I'm sorry? Cites the strength and value in the footnote, though, right? He identifies the factors that are to be applied in the e-Systems test, but he does not apply them. And we would submit that it is an abuse of discretion where a factor clearly, strongly weighs in favor of a party to not at least, if you're going to ultimately weigh the analysis against that party, to not at least explain why you would do that in view of that factor. The problem isn't just those two factors. Even if he's done it before in another order? Why can't he be a little bit more summary if he's done it before? I thought Judge Bobby was saying there was a discussion in the earlier order. Is that wrong? There was a discussion in the earlier order where he acknowledged that the strength and value of the mark weighed strongly in favor of Cosmetic Warriors, but in... Why can't we look at both of those? Because he does go through 1, 2, 3, 4, 5, 6 in the order you're appealing from. Well, I think you can. And if you do look at the summary judgment discussion, then what you see is that that factor weighs strongly in favor of Cosmetic Warriors. Which is what the district court said. Again, I'm not sure why you're arguing the district court failed to do this when the district court addressed it in writing and found in favor of your client. Well, the point is that all of the factors, when you look at all of the factors as a whole, they all very strongly weigh in favor of Cosmetic Warriors. And so these two were not part of the discussion that applied the Latches Doctrine to our case. And I think had you considered these two with the others. So maybe I'll move on to the others if that's okay. Because I think you have to look at it as a whole. These two strongly weighed in favor of Cosmetic Warriors. The next factor is the diligence factor in enforcement. And in discussing diligence, the district court failed to acknowledge the more than 130 enforcement actions that Cosmetic Warriors took to enforce its right in the Lush brand over a 10-year time period, from 2006 to 2015, including enforcement actions against companies who were using the Lush mark to sell clothing. Actually, I'm not sure why this counts in your favor. This one strikes that this goes against you. It shows that Lush was very, the Cosmetic Warriors was very aggressive in defending its brand. It was all over the place. It was going after, you know, one-off stores in remote locations in the United States. But it couldn't find Lush clothing? So the diligence factor, Your Honor, I believe looks to whether the mark owner has slept on its rights. Is it failing to enforce the strength of its mark? Is it failing to enforce against third parties? And so an active policing effort is highly relevant to no latches. It just, right, it just, but it just, you know, it just cries for an answer as to how it missed this one. And you found the spa in Montana or wherever it was, but you couldn't find a clothing company that was operating out of Nordstrom's? Well, so recall, Cosmetic Warriors is based in Poole in the United Kingdom, and there's no evidence in this case. In fact, I would submit the Lush clothing is sold nowhere there. The issues that came to the attention of Cosmetic Warriors did so in various different ways. There was evidence in this case, for example, of a 2006 search report that was conducted, and it was nationwide. It looked at not only things on the federal register, but it looked at things on state registers, as well as internet websites and companies that were doing business at that time. Cosmetic Warriors engaged in a strategy to go after those entities. Importantly, although Pinkett was founded in 2003, allegedly had a website at lushclothing.com in 2003, is nowhere on that search report. It was not identified in that 2006 search report. So things come to the attention of trademark owners in different ways, and in this case, it simply is an unfortunate fact that it did not come to Cosmetic Warriors' attention sooner. But that cuts different ways. I mean, if it's something that probably should have come to their attention, but for some fluky reason didn't, we're looking at it from the perspective of Pinkett. I mean, if they, assuming they were thinking about this, they probably would have thought if there was a problem, they would have come after us by now. Well, that's interesting, because Pinkett walked away from the Canadian trademark office in 2010 without saying a word about the conflict that only it was notified about. Cosmetic Warriors was never notified that Pinkett had had its mark rejected. And then, four years later, when they did actually go and try to challenge the Cosmetic Warriors Lush mark in Canada, they did so anonymously. When they announced their business name in California, they did it in a Korean newspaper only. I mean, there's, I think it is a misunderstanding and a misstatement of this record to suggest that Pinkett was out there trying to bring itself to the attention of Cosmetic Warriors. Did it have an obligation to do that? I think that where you have an infringer who knows about the priority and the senior uses... But, you know, I understand that both companies may be targeting women, but clothing and cosmetics are distinct. You can go to the cosmetics counter at the local department store, or you can go over to the clothing section. They may even be on different floors. Well, as a woman, I respectfully would disagree with that assessment personally. However, I understand my personal view is not part of the record. What I think is part of the record is the unrebutted testimony of Dr. Jakumstaller, who explains that clothing and cosmetics are extremely related. There are dozens of trademark trial and appeal board and district court decisions holding, not quite as a matter of law, but almost as a matter of law, that clothing and beauty products are related goods. Once you got notice in 2010, why did your client sleep on its rights? My client did not get notice in 2010. The district court in this case found that Cosmetic Warriors knew or should have known. There is no finding that this was ever brought to Cosmetic Warriors' attention, and in fact, the testimony at trial was unrebutted that Cosmetic Warriors did not actually know. And what you got in 2010 was notice to your outside counsel? Well, that's not clear. The evidence in the record is that Cosmetic Warriors was engaging in a trademark watch service through outside counsel. There was evidence put into the record that was obtained by a subpoena to Thomson Reuters, which is a watch notice provider, and they gave a printout of what they say are a listing of all the marks that were brought to the attention of Cosmetic Warriors' counsel. However, the record also shows that Thomson Reuters had errors. It had experienced errors in the past where marks that were supposed to have been reported to counsel were not. And the testimony from Thomson Reuters was very clear that even if one of those errors had occurred here with respect to providing that watch notice to Cosmetic Warriors' counsel, that trademark would still appear on his report because he's printing that report from a different source. So he was very clear in his testimony that he could not testify that the information made it to outside counsel. All he could testify is that it appeared in Thomson Reuters' records. So, Your Honor, respectfully, I think the only evidence in the record about who had actual knowledge of the other party in this case is that Pinkett had actual knowledge of Cosmetic Warriors in 2003, again in 2010, and that once Cosmetic Warriors investigated who was possibly attacking their mark in Canada anonymously, they eventually figured out that it was Pinkett, and the dispute between the parties ended up being in court in 2015. I think applying an equitable doctrine requires looking at the equities, and in this case, given the clear evidence of Pinkett's knowledge, and we're applying only constructive notice to Cosmetic Warriors, that it is inequitable to apply it in this case. I think the evidence of unrefuted harm that was presented in the case, harm to CWL from the testimony of Dr. Jakumstaller and other sources, was also not properly considered by the district court. Instead, he relied solely on the fact that Cosmetic Warriors decided not to seek actual damages in favor of seeking injunctive relief, and he decided there was no harm because the jury did not award disgorgement damages. But, of course, disgorgement measures the profits to the other party, not the harm to Cosmetic Warriors and its brand. The district court also improperly conflated the good faith ignorance factor by substituting for it the jury's finding of no willfulness, which, of course, good faith ignorance and willfulness are not necessarily the same thing. In fact, they are not the same thing. And in this case, the jury's verdict, finding no willfulness, did not include information about the things... He said there's no evidence... The evidence is that Pinkett had good faith because the jury found no willfulness. It just didn't... There was not enough analysis to understand why he made that substitution. But it isn't proper, and particularly relying on willfulness when the jury's verdict on willfulness was issued in the absence of evidence about everything that went on with their notice in Canada, and then in face of the testimony of the Pinkett principals during trial to the jury saying they had never had Cosmetic Warriors on their radar until this trial, that was prejudicial. I wanted to ask a question about the evidence issue because the evidence issue kind of troubled me when I first got into this case. And apart from the relevance that you just indicated, which is that it may have somehow controlled what the district court did, or it unduly relied on a jury finding that was not using the same standard and not informed by the evidence that wasn't presented to them. But apart from that, which is kind of indirect, I was having trouble seeing the relevance of the issue that the Canadian evidence was not given to the jury. Because the decisions that were made were made with respect to latches, which were made by the district court after hearing that evidence. Right? So in your brief you say, well, that doesn't address claims of disgorgement and claims of attorney's fees. Well, putting attorney's fees aside, I'm a little puzzled about the claim of disgorgement. The claim of disgorgement was denied based on latches, right? Correct. So when it made the decision with respect to gorges, it made an equitable decision in which it had the evidence before him. So how is the exclusion of this evidence meaningful? And I note that you don't raise it as one of your three arguments. Maybe you just don't want to focus on that argument. But I'm having trouble seeing how the argument gets you anywhere. Well, Your Honor... I mean, it does seem like they should have had the evidence. That was my first intuition. But then I couldn't see why it made any difference. I really don't see how it made any difference. It makes a huge difference. How does it make a difference if he heard it? Because the district court, if you read the district court's decision, he heavily relied, instead of providing his own analysis that this court could review for abuse of discretion, he heavily relies instead on all elements of good faith on the jury's verdict of no-wilfulness. You read his opinion, he doesn't say the jury found this and the jury found that. He just makes his judgment. And he had it before him. So it makes it hard for me to see how, as an evidentiary, you can say he should have relied on it most, and therefore he abused his discretion. I understand that argument. But as an evidentiary opinion, as an evidentiary argument that it should have been presented to the jury, it just escapes me as to why we care about that anymore, since he did have it before him when he made the decisions that you're appealing. I think, Your Honor, it would have also impacted the jury's finding on willfulness, which would have provided an entitlement to attorney's fees to cosmetic warriors. For example, if they did not already have... Can you get attorney's fees if you're not a prevailing party? So first of all, I think, had all this evidence been presented, I think that the advisory verdict would have come out differently on latches, the advisory verdict that the district judge relied so heavily on. I think you also would have had a finding of willfulness. And under the district court's conclusion that good faith and lack of unclean hands to prevent the application of latches means that you have to be an adjudicated willful infringer... I understand that argument. I said at the outset, I understood that argument. I'm saying apart from that, it's hard for me to see how this carries any purport. I just don't see it. I think it all goes into willfulness. If the jury had found willful infringement, which we submit they would have had they been privy to the evidence about the Canadian notice, had the jury found willful infringement, there would be no latches because the district court by his own admission would not have applied it in the face of what he would have determined to be... So you're just focusing all on the fact that in that sentence he used the word because. I think for that reason... If instead he had said, I know it as part of my analysis that they didn't do that, then there would be nothing. You're just putting all your eggs in that basket. I don't think so. Where else? My question has been where else? You keep going back to that. Sure. He has the good faith discussion when he's discussing latches in the E-Systems Center. Right, but he's also heard the evidence. Sure, but he also talks about the unclean hands issue. And in talking about the unclean hands issue, he errs as a matter of law in substituting willful infringement as the only basis. We're just going around in circles then. Okay. I know I'm over my time. I did really briefly want to discuss on the distinct issue with respect to the cancellation. I'll give you a minute to do that and I'll give you a minute for rebuttal, but you'll have to keep it short. Okay, absolutely I will. And Your Honor, recently the Supreme Court has taken up the issue of latches as it applies to actions that are governed by a federal statute of limitations imposed by Congress. That was done in the Petrella and SCA hygiene case. If you read those decisions, it's very clear that the Supreme Court views latches as a gap-filling remedy that only applies where Congress has otherwise failed to provide a specific time period provided to bring a confusion-based cancellation under 1060.4.1 is five years. That's not a statute of limitations. That's different. If you read the decisions in Petrella and SCA hygiene, the court talks about how do you determine whether something is a statute of limitations or not, because that very issue was presented with respect to the Patent Act and SCA hygiene. And what Justice Alito explained is that statutes of limitation are time periods provided by Congress in which a party is to take an action. Right. Well, that's a broad reading. It's a time within which you may bring a lawsuit. Well, and in this case, the time period is in which you can bring an inter-party's proceeding for likelihood of confusion-based cancellation. And Congress has expressly provided a five-year time period for that. The general statement in the Lanham Act that equitable defenses such as latches, acquiescence, and estoppel, where applicable, may be applied in all inter-party's proceedings, has application to other cancellation actions. There are other actions under... And what do you do with footnote 15 in Petrella? Footnote 15? Yeah. Footnote 15 says that the decision doesn't apply to Lanham Act cases for infringement. That's under 1115 of the Lanham Act, and that's about bringing lawsuits in federal court. And the reason that the decisions in Petrella... Well, it just says generally the Lanham Act contains no statute of limitations, expressly provides for the defensive use of equitable principles, including latches. But that's under 1115, and that's Lanham Act trademark infringement claims. The court was not considering at all the cancellation actions in the Trademark Trial and Appeal Board when it wrote that. And it is true that the Lanham Act as to trademark infringement claims brought in federal court... We have lots of deadlines, but deadlines aren't necessarily statutes of limitations. You have a certain amount of time to file an answer. We don't refer to that as a statute of limitations. But the five years in the cancellation action under 1064.1 is a statute of limitations. If you do not bring a likelihood of confusion-based objection to a issued trademark registration within five years of its issue, for whatever reason, if you do not do it within five years of issue, you are barred. It is a statute of limitations, and it is applied as a statute of limitations by the Trademark Trial and Appeal Board. What do you do with our cases that say that we look to state laws and that we give a strong presumption? That is true with respect to infringement claims brought under the Lanham Act in federal court, because infringement claims brought in federal court don't have a statute of limitations. You borrow the state court's analogous statute. That was expressly discussed by Justice Ginsburg in Petrella, saying where you're borrowing a state statute of limitations where the statute itself doesn't have one, what they're saying in Petrella doesn't apply. What they're saying in Petrella is where Congress has imposed a statute of limitations in which to act, courts cannot bring in equity to fill. Equity is a gap-filling doctrine, and where there is a congressional statute of limitations, equity is not applicable. And what I'm saying about 1064 sub 1 is that that type of a cancellation action, Congress has said, only can be brought within five years of issue. It cannot be brought at any other time. Abandonment-based cancellation actions, certification mark cancellation actions, other types of cancellation actions can be brought at any time, which the courts have construed to mean there is no statute of limitations provided for those, and equitable defenses would apply in those cases. The five-year period for confusion-based cancellations is a statute of limitations, and under Petrella and SCA hygiene, equitable principles are not able to be applied to bar suits that are brought within that period. And we, I gather, are the first court of appeals to be asked to decide this issue in the world, or not, in the country? To my knowledge. We just have that TTAB decision, and that's it. And I don't believe that the TTAB has actually expressly considered at all how Petrella and SCA hygiene impact the issue of whether the five-year confusion-based cancellation proceeding is barred by the analysis of Petrella or SCA hygiene. All of the decisions that I've seen talking about how you can use equity in a confusion-based cancellation action, don't discuss Petrella or SCA hygiene at all. They're relying on older decisions that have said that these are available. And, of course, the law of every court across the United States also used to apply latches to patent cases and also used to apply latches to copyright cases. But after Petrella and SCA hygiene, that is no longer the law. The Supreme Court was not trying to limit its analysis there to a certain type of case, and that's what SCA has done. And we're supposed to judge that the Lanham Act does have statute of limitations, even though the court says in footnote 15, referring to a Seventh Circuit case, failing to observe that Lanham Act contains no statute of limitations. The court was talking about the trademark infringement-based action. That's not what it said. There's no reference to infringement in there. Well, the case that they're citing, too, is talking about infringement. Well, that may be, but the footnote is fairly general. Well, the problem is it conflicts with the language of the Lanham Act itself. And so if you look at 1064-1... So footnote 15 is just wrong? To the extent you interpret it as applying to anything other than an infringement action, yes. But the court, I believe, in Petrella and SCA hygiene was being confronted with questions about trademark infringement actions brought in federal court, not with questions about cancellation actions at the TTAB. That just issue was not on their radar screen. And so it is true there is no statute of limitations in the Lanham Act as it pertains to bringing suits for trademark infringement. It is not true that there is no statute of limitations in the Lanham Act under 1064-1 for bringing cancellation. I thought Petrella was about the Copyright Act. It is. Okay. So it didn't have anything to do with the Lanham Act. It didn't. But there were arguments being presented about whether some of the analogy arguments were that we apply latches in trademark cases. And she was simply saying application of latches in trademark cases is consistent with what we're saying today, that it's a where Congress has not otherwise provided a specific time period in which to act. Okay. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Kevin Bringell for Appellee Pinkett Clothing. This case below ended up being a relatively straightforward application of latches and denial of injunction. The facts of this case were not different from the leading case, E-Systems, from this Court. They were not, I mean, they weren't exactly on all fours, but in many similar respects. There's one interesting aspect of this case that you don't see in too many cases, which is the junior user has a registered mark, that the latches were so severe and the senior user slept on their rights so severely that the junior user was able to obtain a registered mark. That's the same case that you have in E-Systems itself. I understand in E-Systems, this Court took pains to explain that any time you're going to deny an injunction on latches, that there is, what that means is that the senior user is being deprived to some degree, however small, of controlling its mark and controlling its goodwill, and because there's been some finding of confusion, that there's some risk, however small, to the public of confusion. But the E-Systems case itself says that those considerations are built into the doctrine of latches, which Congress has deliberately expressly put into the Lanham Act, and that they can be outweighed as a court sitting in equity, a court considering all the factors can decide that they're outweighed. That's exactly what happened in E-Systems, and based on very similar facts, that's what the Court did in this case, even after the jury did the same thing with an advisory verdict. So, what Appellant is asking this Court to find is that the jury got it wrong, and the Court, after hearing additional supplemental evidence, also got it wrong, and that the Court abused its discretion in doing so, and somehow committed clear error in making the findings that it did. I don't think this Court can or should do that, because the findings that the District Court made here were very clear, and were based on not just minimal evidence, but considerable evidence. And for that reason, they're not clear error, and this Court shouldn't be reversing those findings of fact. Now, as already noted, in making the E-Systems determination, the Court, first of all, did go through each factor in its summary judgment order. That's clear, that's in writing. Secondarily, the Court had an oral ruling, a finding of findings of fact and conclusions of law, in which it mentioned the E-Systems factors, and then issued a written order denying Appellant's motion for an injunction, in which it said it was applying the E-Systems factors, it listed all of the E-Systems factors, and then said that it had applied them, and then it said, in its application, the Court considered these factors, and then it said, you know, for instance, and it's true, then it did not, in a discursive manner, list two of the factors, or address two of the factors. That's true, that's in the record. What I think I heard counsel for Appellant say is because they think that one of the factors, the strength of the mark, weighed heavily in their favor, this was somehow reversible error. This isn't so. This very Court, in the Grupo Higante decision that we cite, stated that even if one of the factors weighs heavily in favor of one party, it doesn't mean that it can't be outweighed by all the others, or any of the others. Again, this is a Court sitting in equity. The whole purpose of equity, and the whole function of equity, of a Court sitting in equity, is to consider all the factors. The E-Systems factors themselves are not even an exhaustive list, of course, right? This is a Court sitting in equity. It can consider any factors. So it's a non-exhaustive list, and it's a balancing test, and by nature, when district courts engage in balancing tests, especially sitting in equity, they are to consider any and all factors, and they balance them all, and of course, even if one factor weighs heavily, it can be outweighed by the others. And that's what happened here. So the Court did take a discursive attempt to describe those factors that it found weighed in Pinkett's favor. So in other words, what it took Payne's to be discursive about was to defend its decision, to say, these are  Could it take into account, as part of a broad examination of the factors, a plaintiff's sort of playing games? Not that you were, but they could. Could they or not? Sitting in equity, I think a Court can take note of almost any fact, as long as it's not clear erroneously so. Okay. And that's just, I've got to tell you, the one concern I have about your position is that it looks like, or at least they describe, your opponent describes it as sort of lying in wait, and keeping a low profile, knowing that there might be some problem. So what exactly is a, in order to not have that factor weigh against you, what is somebody in your with another person using the same mark in a different but maybe related area? One way, and this would arguably happen when you lose your application in Canada in 2010, it's kind of a red flag or a signal or something. One way to deal with that is to say, well, we don't think that's different. That's Canada, and that's t-shirts, and that's not what we do, and it's not our country, and we've already got this one here, so it's probably not a problem. Let's just lie low and hope that it never blows up, and in the meantime, continue to do what we're doing. Or, the other thing you could do is to write a letter and say, we don't think this makes a difference, and we want you to know that that's what we don't think. That way you might be able to avoid the problem when it might come up later. I it seems like it would be better for the system if you did the latter rather than the former, but when you start, they say you put public notices in Korean language newspapers and stuff like this makes it sound like you're actively trying to hide. Can you respond to that? Do you see what my concern is? I do, Your Honor. I think I understand the hypothetical. First of all, of course, I want to note it's counterfactual, and I'll get to why I think that is, but the answer is I think going back to the oldest English common law, that's not an element of latches, which is what the defense here was based on. Yeah, but you said we can take wide things into account in the exercise of equity. We're supposed to take all you went on for several minutes about the breadth of the things that we can take into account in making this balance, right? Yes, of course, Your Honor. This is what the district court was aware of. This is why I think it's counterfactual, which is important to answer the court's question. First of all, the district court here made an express finding that Pinkett acted openly and notoriously, was using this. That's the phrase of the district court's finding of fact, that they operated for 14 years and they registered the mark. That's true. I'm sorry? Certainly, I understand. That's consistent with knowing that someone else thinks you might be doing something wrong. That was my hypothetical. You have some indication, some flag that comes up, oh, there's somebody over there. And at least in Canada, they would have a problem doing what we're doing and we're not doing that much different from what people are doing in the United States. So it's a hint, it's a flag. I'm not saying it's noticed or some legal standard. It's just something has arisen on the horizon. There's two ways to deal with that. One is to hunker down or whatever the word is and the other is to say, let's get this out in the open. Let's figure out whether we indeed have the rights, which we assume we do and they don't, or it's to wait so that if this thing ever does blow up, we'll be able to argue latches. All right? You see what I'm saying? You know, there's two ways you could go. I do, but I think it's really important to understand what happened in 2010 with Canada, what the situation was and why it doesn't provide any sort of notice as the court might, it seems might assume. That would be the most direct answer, I think. Yeah. I'll skip straight to Canada. So what happened in 2010, the situation in Canada was Cosmetic Warriors owned a registered mark in Canada for clothing, for Class 25, namely t-shirts. In the U.S., they did not, of course, and they never have to this day. In the U.S., it was the inverse. Pinkett owned the registered mark in clothing. So when Pinkett applied for a mark in clothing in Canada in 2010, that's when they received the notice and the notice said, we're not going to accept this because there's a pre-existing registration. This is at page 184 of the record and the registration to which it referred by registration number is at page 173 of the record. You look at page 173, the registration to which the Canadian court referred them was the registration for clothing. So what Canada was saying was, we aren't going to allow two registrations, registrations from two different companies for Lush on clothing. Right? That, if anything, tells you the opposite of notice that there is a problem in the U.S. What it says is, the one who has the registration for clothing is in the clear, which was the situation in the United States. So the fact to think that that was notice of a problem in the United States lies opposite. Well, it's at least notice that there's some overlap in the markets with respect to this trademark. Not in the United States because they weren't selling clothing in the United States. Cosmetic Warriors was not. So it's not enough of an inference if you find that in a market that in many respects is similar to America. Then we have the benefit of the supplemental evidence regarding this Canada question that the district court heard after the jury verdict. This is from pages 114 to 143 of the record where Edward Kim testified. And they got to cross-examine him as much as they wanted. And they asked these questions. Didn't you receive this notice? Were you told about it by your lawyers? And he said, yes, I believe our lawyers told us about it. Did this change your behavior and why not? And he said, no. My understanding was Canadian law was different than U.S. law. And we had the registration in the U.S. and there wasn't a problem. It's that testimony along with all the Kim's testimony that the district court said that it found to be not just credible, but very credible. And of course it's that sort of credibility finding that under. Right. I understand that's part of my hypothetical is that exactly something like that happened and they came to the conclusion that they were doing everything right. But you can come to the conclusion that you're doing everything right and also realize that some court might disagree with you. And so the thing to do is to get it out in the open, get it settled so that you don't take a chance that later on you'll have wasted your investments. Or you can just not get it resolved now. Right. That's perfectly consistent with having your lawyers can tell you you're right. There's a 2% chance that you're wrong or a minimal chance that you're wrong or imply that or whatever. And you can say, well, let's just keep going because we're relying on our lawyers and we're not going to get this result. We're not going to even, we're going to hope it never arises. I think what they were actually believing was that it wasn't a problem, not hoping that it was a problem that wouldn't come to a head. Well, then why are they maintaining such a low profile about it then if it's not a problem? You see, that's what they're suggesting and it's a suggestion. It's a little troubling. They say you kind of were hiding. It's contrary to the record and it's contrary to the district court's express finding that they were operating open and notoriously throughout the entire 14 years. You can't say that somebody who registered a mark in the United States Patent and Trademark Office is hiding. You can say it, it just may have a, you know, I mean. Well, it explains some things, but it doesn't explain other things. If you're not hiding, you could write them a letter saying, we know there's this problem, but it's not a problem for these reasons. Not that you have to, of course, but that's different from, I mean, why do you, that puzzled me. Why do you put a public notice in a Korean language newspaper? Because they're Korean, Your Honor, and they work in the garment industry in Los Angeles. In Korean? I mean, their business, the business that, well, who does this notice go to anyway? I think they're saying it was in the public notices section of a wide circulation newspaper in Los Angeles. I see. Can I ask you, you have very little time left, about the cancellation? Yes, Your Honor. About the 1064-1, you heard your opponent's argument there. I'd love to hear your response. Yes, Your Honor. Obviously, as has already been noted, SCA Hygiene and Petrolet, neither of them are trademark cases. And we do have them both expressly noting that the Lanham Act is different, number one. And as has already been noted, the footnote in the petition. Yeah, that number one doesn't really fly with me because, as your opponent argued, maybe what the court was referring to in that footnote were infringement actions for which there is no statute of limitations. And in fact, that's the very premise that was noted in the footnote. It seems like 1064-1, I don't know, maybe you disagree. It seems like that is a statute of limitations. It says five years, and Congress set that limit. Yes, Your Honor. First of all, the footnote isn't clear that it's only referring to infringement. It doesn't say so. It says the Lanham Act. The Lanham Act has two separate statutory provisions regarding latches applying. It's got 1115 regarding infringement, and it's got 1064 regarding cancellation. Right, and the one that's cited in the footnote is the 1115, which has no statute of limitations. That's what the court was talking about, right? I don't think the footnote is expressed in that regard, Your Honor. If I'm incorrect, then I will... Well, let's look. Okay. You want to... So it's footnote 14. I thought I was just looking at it, and it said... If I'm incorrect, then I apologize, Your Well, it's referring to 1115B9. Yes, Your Honor. Which statute is that? That would be infringement. Okay, so what's your response? My response is that the cancellation provisions in 1064 are not statutes of limitations. You can file for cancellation after five years, just under narrower grounds, as the statute makes clear. And second of all, we're not It's not a statute of limitations. It's not labeled as a statute of limitations. Second of all, we have, after Petraea, the Patent and Trademark Office has promulgated a regulation. This is in our brief, 37 CFR 2.1114, that says... This was promulgated in January 2017, that says that we are going to allow... That latches is permissible in these cancellation actions. And of course, there's a host of cases... Well, even with an action that needs to be brought within the five years? Yes, Your Honor. That's what the regulations promulgated in January 2017 says. And then of course, I understand this is before Petraea and SEA hygiene, but there is, as just one example cited, the Pro Football versus Harjo case. That's the DC Circuit. Again, it is earlier. It's 2005, but it addresses this argument, not in the context of Petraea, of course, but it addresses this argument, is latches available? Because really, they're need Petraea and SEA hygiene to tell you, to make this argument, and people did, and it was rejected in Pro Football. The only gloss they're adding with SEA hygiene and Petraea is to say the Supreme Court took interest in this, where there is no statute that says latches pertains, which is not, even in the cancellation provision, the case when it comes to the Lanham Act. What's the regulation? You said it again. It is 37 CFR 2.1114B2. Yes. Got it. And that is, that was a 2017 regulation? Yes. January 2017. Okay. I see that I'm out of time. If there's no further questions. I don't think that... I'm sorry, just because I'm looking at it, and isn't this just a regulation that specifies what the contents of an answer in one of these? It says that the answer may contain that latches defense. Yes, Your Honor. What does that have to do with the argument? That's not addressing the argument we're contending with here. That's no different than 1069, just saying generally, as a matter of general principles, latches can be invoked in these kinds of cases. In a cancellation action filed within five years. No. That's what I'm, okay. Well, I'll look at it more closely, but it doesn't seem like it addresses this particular argument. I understand, Your Honor. I thought that's what it would, certainly the way I read it, I certainly would refer the Court to the Ava Ruha case that we've cited in addition to in the pre-Petrea context. It's already been addressed as a statutory issue. Okay. Thank you, counsel. Ms. Zimmerman, I'll give you two minutes. Ms. Scobie, I'm sorry. That's all right. Thank you, Your Honor. So, with respect to the regulation that was just cited, that is very similar to the Rule 12 defense that was raised in Petrela, and the Court said the fact that certain defenses are listed as being available to plead in an answer does not mean that constitutionally those equitable defenses are applicable to every type of claim that might be brought, and specifically in Petrela, they are not applicable where Congress has otherwise provided for a specific statute of limitations. The other cases that have been cited by Appellee were decided before Petrela in SCA hygiene, and I think they have no relevance because this was an issue that was considered by the Supreme Court to sort of be a new take on how to treat statutes of limitations in respect to these cases. So, I think that after Petrela in SCA hygiene, you cannot read 1064.1 other than as saying, if you bring a cancellation action within five years after the registration of a mark, there is no equitable defense of latches, and that is what happened here. Cosmetic Warriors cancellation was brought within five years, and it should proceed. With respect to E-Systems, the assertion was made that this case has very similar facts to the E-Systems case, and it really doesn't, because what distinguishes this case from almost all of the other cases that have been cited by the parties is that in E-Systems, there was no dispute that neither party had notice of each other. In this case, the record shows that it is undisputed, regardless of what credibility you give to the testimony of Pinkett, it is undisputed that they knew from day one, they knew that Cosmetic Warriors had Lush as a mark, and the Tisch case from the Seventh Circuit, which we cited, and other cases say, where you're going to take a risk like that, it's incumbent on you to do something to try to figure it out, and it should not be put the full burden of Pinkett's decision to take that risk, to knowingly adopt the label that they knew already belonged to someone else, when they knew about the relationship between the parties' goods, and to continue to charge forward starting in 2010, even though they knew about the conflict between the parties' marks, with the actual knowledge on their part, and the disputed and no evidence of knowledge on Cosmetic Warriors' part, it is inequitable to hold all of that delay period against Cosmetic Warriors. Thank you, Your Honors. Thank you, Counsel. We thank both Counsel. It was a helpful argument. Pinkett Clothing is submitted, and with that, the Court has completed its oral arguments for the day. We stand in recess until tomorrow. All rise.
judges: Rogers, Bybee, Watford